## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

RONALD JACOBSEN,

        Plaintiff,

   v.

Special Agent LAWSON ALLEN, in his individual capacity, and Investigator CHARLES ROPER, in his individual capacity,

        Defendants.

Civil Action No.

**COMPLAINT &
JURY DEMAND**

Plaintiff Ronald Jacobsen, by and through his attorneys, hereby alleges as follows:

### <u>INTRODUCTION</u>

1.    Ronald Jacobsen spent more than 30 years—from age 29 to 60—wrongfully imprisoned for crimes he did not commit: the January 6, 1990 abduction and rape of B.T.[1]

---

[1] To protect the victim's privacy, she is referred to by her initials only.

2.    Mr. Jacobsen is completely innocent of and had nothing to do with these crimes. At the time B.T. was abducted from a convenience store in Covington, Georgia, Mr. Jacobsen was spending the night in Tennessee, over 150 miles away. Ultimately, post-conviction DNA testing on the victim's rape kit proved Mr. Jacobsen's innocence.

3.    Mr. Jacobsen's wrongful conviction was not an accident but rather, the result of misconduct by Defendant investigators.

4.    Although the victim consistently made clear the assailant was a stranger to her, Defendants unreasonably suspected it was an ex-boyfriend, and settled on Mr. Jacobsen. In the absence of reliable evidence implicating him, they manufactured some.

5.    In particular, Defendant Georgia Bureau of Investigation ("GBI") Special Agent Lawson Allen and Newton County Sherriff's Office ("NCSO") Investigator Charles Roper fabricated evidence, including a statement attributed to Mr. Jacobsen, and used improper suggestion to obtain false identifications.

6.    Mr. Jacobsen has always maintained his innocence; he truthfully testified on his behalf at his 1990 criminal trial and presented witnesses to his alibi. Unsurprisingly, given his innocence, no physical or forensic evidence ever

2

implicated him. But for Defendants' misconduct, Mr. Jacobsen would never have been prosecuted or wrongly convicted.

7.      Throughout his wrongful incarceration, Mr. Jacobsen continued to work to prove his innocence. Ultimately, with the help of the Innocence Project, Mr. Jacobsen obtained court-ordered DNA testing on the rape kit collected from B.T., which had been unavailable at the time of his trial.

8.      The testing provided scientific evidence of Mr. Jacobsen's innocence, conclusively excluding him as the source of DNA in the rape kit sample collected from B.T.

9.      On February 5, 2019, the Superior Court of Newton County granted Mr. Jacobsen's motion for a new trial and vacated his convictions and sentences based on this new exculpatory DNA evidence. However, the charges remained pending, and Mr. Jacobsen remained wrongfully detained until he was able to post bond in November 2020. Ultimately, on August 15, 2021, the prosecution finally ended when all charges were dismissed.

10.      In all, Mr. Jacobsen spent 30 years, 9 months, and 21 days incarcerated for crimes he did not commit.

11.     Through this civil rights action, Mr. Jacobsen seeks to bring the Defendants' misconduct to light and to ensure they are held accountable for their actions. Mr. Jacobsen also seeks justice for the more than thirty years that he lost as a result of his unjust conviction.

## JURISDICTION AND VENUE

12.     This action is brought pursuant to 42 U.S.C. § 1983 to redress the deprivation under color of law of Plaintiff's rights as secured by the United States Constitution.

13.     This Court has federal question jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343.

14.     This Court has supplemental jurisdiction over Plaintiff's state law claim pursuant to 28 U.S.C. § 1367(a).

15.     Venue is proper in the Northern District of Georgia under 28 U.S.C. § 1391(b) in that this is the District in which the claims arose.

## JURY DEMAND

16.     Plaintiff demands a trial by jury on all issues and claims set forth in this Complaint, pursuant to the Seventh Amendment of the U.S. Constitution and Federal Rule of Civil Procedure 38(b).

## PARTIES

17.     Plaintiff **RONALD JACOBSEN** is a citizen of the United States and is currently a resident of the State of New York. At all times relevant to this Complaint, Plaintiff was a resident of Dekalb County and the State of Georgia. Mr. Jacobsen was wrongfully convicted of aggravated sodomy, kidnapping with bodily injury, and aggravated assault on June 12, 1990.

18.     Defendant **LAWSON BIMM ALLEN** was at all times relevant to this Complaint a duly appointed and acting Special Agent of the Georgia Bureau of Investigation, acting under color of law and in his individual capacity within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the State of Georgia. He is sued in his individual capacity.

19.     Defendant **CHARLES FRANKLIN ROPER** was at all times relevant to this Complaint a duly appointed and acting Investigator of the Newton County Sheriff's Office, acting under color of law and in his individual capacity within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of Newton County and the State of Georgia. He is sued in his individual capacity.

## STATEMENT OF FACTS

### A stranger abducts and rapes B.T.

20.     Shortly after 4:00 a.m. on Saturday, January 6, 1990, a single assailant abducted B.T. at knifepoint from Golden Pantry, a convenience store in Covington, Georgia, where she was working as a clerk on an overnight shift.

21.     During the abduction, the assailant—described by B.T. within hours of the attack as a stranger who was stout and 5'9" or 5'10"—went behind the store counter where B.T. stood and told her he had a knife and she had to come with him out to his truck. B.T. refused. The assailant then struck her in the side of the head with such force that her blood was strewn across the store floor. The assailant carried his dazed victim outside and put her into his truck—a silver 1970's Toyota with manual transmission.

22.      Before he could drive away, B.T. came to, jumped out of the truck, and ran back into the store where she attempted to use the store phone to call for help. The assailant thwarted her escape, ripping the phone away from her and striking her again in the head. At that point, the assailant told B.T. he would kill her if she didn't go with him. She complied.

23.     After the assailant sped away from the scene, the assailant forced B.T. to perform oral sex on him as he drove up I-20 in the direction of Atlanta. He stopped at several locations in Rockdale County where he repeatedly vaginally and anally raped B.T. in the truck.

24.     During one stop, the assailant allowed B.T. to sit up in the truck and smoke a cigarette. After surveilling her surroundings, B.T. realized she was in a familiar area and contemplated escaping to the home of a friend, Ronald Jacobsen, who lived nearby. Ultimately, she deemed it too risky to attempt escape at that time.

25.     However, a few hours after her initial abduction, B.T. had another opportunity to escape when the assailant's truck ran out of gas approximately 30 miles west in DeKalb County. As they were pulled over on the side of the interstate, a car stopped to see if they needed help. Unaware of B.T.'s dire situation, the passerby offered to take the assailant to get gas. Immediately after the assailant left to get gas, B.T. fled to the safety of a nearby home. Shortly thereafter the police were called and she was taken to a hospital.

**Ronald Jacobsen is innocent.**

26.     Mr. Jacobsen is completely innocent. He was not present for and had no involvement whatsoever in the abduction or sexual assault of B.T.

27.     At the time B.T. was abducted and being attacked in Georgia, Mr. Jacobsen was spending the night with his pregnant girlfriend and her family in Tennessee—over 150 miles away.

28.     Mr. Jacobsen did not match the description B.T. gave initially of her assailant—most notably because B.T. repeatedly insisted her assailant was a stranger, while Mr. Jacobsen was a friend whom she had briefly dated months earlier. At 6 feet 3 inches, Mr. Jacobsen was also half a foot taller than the assailant B.T. described.

29.      Mr. Jacobsen did not own or have access to the vehicle used by the assailant: a silver 1970's Toyota truck with manual transmission. Instead, Mr. Jacobsen drove a compact vehicle: a Ford Mercury Capri.

30.     Post-conviction DNA testing identified DNA left by the rapist in the rape kit collected from B.T. hours after the crime; Mr. Jacobsen was conclusively eliminated as the source.

**B.T. describes her abduction and assault by a stranger to Defendants Roper and Allen.**

31.     At approximately 4:30 a.m., after a customer found the Golden Pantry empty, with blood spattered across the floor, the Newton County Sherriff's Office was alerted and came to the scene.

32.     Defendant NCSO Investigator Charles Roper was assigned as the lead on the investigation. He was assisted at the scene by multiple other NCSO officers.

33.     During the earliest investigation into B.T.'s disappearance—and before she had been located or given any description of the attack—NCSO investigators began to explore whether B.T. could have been abducted by someone she knew, such as an ex-boyfriend.

34.     While NCSO officers were investigating the scene of the Golden Pantry, 30 miles away B.T. escaped from her assailant and fled to a nearby home. Local police took B.T. to the county line where she was met by the NCSO, who took B.T. to Newton General Hospital.

35.     Shortly after investigating the crime scene and within a few hours after B.T. escaped her attacker, Defendant Investigator Roper interviewed B.T. at the Newton County Hospital Emergency Room.

36.    B.T. recounted to Investigator Roper how a stranger had entered the store, abducted, and raped her. She described her attack and her attacker in great detail. Her initial account included how she had at one point passed by a friend's house (by which she meant Mr. Jacobsen) and considered attempting to escape to safety.

37.    B.T. repeatedly told Roper that she did not know her attacker and had never seen him before that night. She described his appearance—including that he was only 5'9" or 5'10"—and gave a detailed description of his clothes and the silver pickup truck he was driving.

38.    Two days after the attack, on January 8, Georgia Bureau of Investigation Special Agent Lawson Bimm Allen was brought on to join the investigation. After that point, Defendants Allen and Roper jointly led the investigation and conducted most of the critical investigative activities on the case together.

39.    On January 9, B.T. met again with Defendant Roper, this time joined by Defendant Allen, and reiterated her description of the attack she had given immediately after the crime, including that the attacker was a stranger to her and that she had thought about escaping to the safety of her ex-boyfriend Ron Jacobsen's

house, which was near one of the places the assailant stopped. Defendants Roper and Allen drove her on the route that her assailant had taken her, and B.T. pointed out the various locations where she was sexually assaulted in Newton, Rockdale, and DeKalb counties.

### Despite B.T.'s consistent account that she was attacked by a stranger, Defendants Roper and Allen build a false case against Mr. Jacobsen.

40.    Beginning only a few hours after the attack, B.T. consistently described her attacker as a stranger. Nevertheless, in the absence of leads toward the true perpetrator, Defendants Roper and Allen unreasonably focused their investigation on Mr. Jacobsen—whom B.T. knew as a friend she had briefly dated the year before. Defendants Roper and Allen misrepresented how Mr. Jacobsen became a suspect.

41.    Under mounting pressure to arrest the assailant, but without any credible evidence to support the theory that Mr. Jacobsen was responsible—because he was innocent—Defendants Roper and Allen resorted to manufacturing it.

42.    First, on January 10, 1990, Defendants used improper means to obtain a false identification of Jacobsen from Robert Knight, a friend of B.T.'s father who had been in the Golden Pantry shortly before B.T. was abducted.

43.    Defendants Allen and Roper reported that Knight positively and definitively identified Jacobsen as a man he had seen in the Golden Pantry store at

11

approximately 4:00 a.m. on January 6, 1990. Knight had not actually seen Jacobsen in the Golden Pantry—because Jacobsen was not there. Defendants Allen and Roper used improper suggestion to obtain the false identification from Knight, and misrepresented and concealed from the prosecution and defense the circumstances of the interview and other evidence which demonstrated Knight's identification was fabricated and unreliable.

### Defendants Allen and Roper pressure vulnerable B.T. into falsely identifying Mr. Jacobsen.

44.     On January 11, armed with the false identification they had improperly obtained from Knight, Defendants Allen and Roper spoke to B.T. again. During this meeting, Defendants told B.T. that her account was wrong, her assailant was not a stranger as she had described but her friend and ex-boyfriend, Mr. Jacobsen. B.T. told Defendants unequivocally that the man who attacked her was not Ronald Jacobsen.

45.     Astonishingly, Defendants Allen and Roper refused to accept B.T.'s truthful account. They asked her to take a polygraph, and B.T. agreed, but ultimately none was given.

46.     Defendants Roper and Allen continued to pressure B.T. to change her description of the assault and identify Mr. Jacobsen as her assailant. They falsely

told her they knew as a fact that Mr. Jacobsen had committed the crime and repeatedly pressured the vulnerable B.T. to repeat the account they fed her.

47.    At this time Defendants Roper and Allen knew B.T. was particularly vulnerable and susceptible to police suggestion, both because she had just been the victim of a violent abduction and rape and because she had suffered from mental health issues, including a fairly recent mental health hospitalization.

48.    Although Defendant Roper had tape-recorded a prior interview of B.T., Defendants Allen and Roper did not record their interaction in which they pressured B.T. to falsely identify Mr. Jacobsen as her assailant. Ultimately, the vulnerable woman relented to Defendants' pressure and agreed to implicate Mr. Jacobsen. It was only after this suggestion and coercion succeeded that Defendants began to audio-record the January 11 interview.

49.    The description of the assailant in the audiotaped January 11 statement reflects the false information fed to B.T. by Defendants Roper and Allen, and which they coerced and pressured her to adopt. This description is completely inconsistent with B.T.'s three prior descriptions of the assailant on January 6, 9, and finally, earlier that very same day on January 11. Defendants knew this statement was the false and unreliable product of their own improper tactics.

13

**Defendants Allen and Roper fabricate a statement from Mr. Jacobsen.**

50.    On the following day, January 12, Defendants Allen and Roper met with Mr. Jacobsen and conducted a tape-recorded interview of him at the Newton County Sherriff's Office. Mr. Jacobsen waived his *Miranda* rights and cooperated with officers, including by submitting to a lengthy interrogation. During the taped interview, he honestly stated that he was innocent, that he was not the person who attacked B.T., and he truthfully told Defendants that he had been out of state—over 150 miles away—at the time of the crime, staying with his pregnant girlfriend and her family just outside Chattanooga, Tennessee.

51.    At the end of the interview, Mr. Jacobsen voluntarily consented to have hair, blood, and saliva samples collected from him to be compared against evidence taken from B.T.

52.    Defendants Allen and Roper did not report Mr. Jacobsen's exculpatory statement that he had been in Tennessee at the time of the crime. Instead, they fabricated a false account they attributed to Mr. Jacobsen. In particular, they falsely represented that Mr. Jacobsen had claimed to be at the Decatur, Georgia home where he lived with his roommate George Hatcher the morning of January 6. Both

14

Defendants Allen and Roper wrote up reports repeating this false and fabricated account.

53.    The fabricated statements Defendants attributed to Mr. Jacobsen were then used as false evidence of guilt, falsely suggesting that Mr. Jacobsen had been in the area at the time of B.T.'s abduction and assault and had an opportunity to commit the crime, and undermining the powerful alibi evidence.

54.    Defendants Allen and Roper never disclosed the exculpatory audio recording of their interview of Mr. Jacobsen to the trial prosecutor, judge, or Mr. Jacobsen's defense attorney.

55.    Despite the lack of any true or reliable evidence implicating Mr. Jacobsen, Defendant Roper swore out warrants for his arrest for assault, sodomy, and kidnapping.

56.    That same day, on January 12, Defendants Allen and Roper arrested Mr. Jacobsen.

**Mr. Jacobsen is wrongly convicted based on fabricated evidence.**

57.    Mr. Jacobsen was tried in June 1990.

58.    No physical or forensic evidence implicated Mr. Jacobsen. Although fingerprints were lifted from the telephone inside the Golden Pantry which the

assailant touched during the assault, none belonged to Mr. Jacobsen. Nor was there any evidence linking Mr. Jacobsen to the silver Toyota truck used by the assailant.

59.    The only evidence presented against Mr. Jacobsen at trial was the product of Defendants' misconduct. Due to Defendants' improper suggestion, B.T. falsely identified Mr. Jacobsen as her assailant and Knight falsely identified him as the person he had seen in the Golden Pantry at 4:00 a.m. on January 6, 1990. The jury learned that B.T. had initially reported her assailant was a stranger, but did not learn the true circumstances leading to either her identification or Knight's, which demonstrated both identifications were unreliable.

60.    Mr. Jacobsen truthfully maintained his innocence at trial and testified in his own defense. The crime took approximately two hours, beginning at around 4:00 am on Saturday January 6, 1990 in Covington, Georgia. Mr. Jacobsen truthfully testified that the night of Friday January 5 until the morning of Saturday, January 6 he stayed outside Chattanooga, Tennessee with his girlfriend (who was pregnant with his child) and her family and friends. A number of witnesses testified for the defense and confirmed that Mr. Jacobsen was in Tennessee from the night of January 5 through the morning of January 6.

61.     However, this truthful evidence that Mr. Jacobsen was in a different state at the time of the crime was consistently impeached by the evidence fabricated by Defendants Roper and Allen, falsely claiming that Mr. Jacobsen had admitted to being in Georgia the morning of the crime.

62.     After a two-day trial, on June 12, 1990, Ronald Jacobsen was wrongly convicted of aggravated sodomy, kidnapping with bodily injury, and aggravated assault.

63.     On August 21, 1990, Mr. Jacobsen was sentenced to life imprisonment.

**After over 30 years of wrongful imprisonment, Mr. Jacobsen is released from prison and the charges against him are dismissed.**

64.     Mr. Jacobsen never stopped proclaiming his innocence and fighting to be released from prison. After over two decades of wrongful incarceration and countless unanswered pleas for help, in 2013, the Innocence Project accepted Mr. Jacobsen's case. Their investigative efforts led to the discovery of new material evidence demonstrating his innocence.

65.     The Innocence Project located vaginal swabs from the victim, B.T., which were collected as part of the rape kit taken at the hospital the morning of the attack. B.T. reported to hospital personnel that her attacker ejaculated during the

17

vaginal, anal, and oral rapes, and that before the assault she last had consensual sex on December 31, 1990—almost a week prior.

66.    Although the victim's rape kit was sent for forensic analysis prior to the 1990 trial, no forensic evidence could be developed to identify the man who raped her due to limitations in forensic technology at the time.

67.    In 2015, the Superior Court of Newton County granted Mr. Jacobsen's request for new testing of B.T.'s rape kit. The GBI first performed a test that confirmed the presence of male DNA on the rape kit swab collected from B.T. immediately after her attack, and then performed DNA analysis.

68.    Test results yielded DNA from two individuals on the sample collected from B.T.: DNA consistent with B.T. and DNA from an unknown man. Mr. Jacobsen was conclusively excluded as the source of the male DNA.

69.    Based on this newly discovered DNA evidence, Jacobsen moved for a new trial.

70.    On February 5, 2019, the Superior Court of Newton County granted Mr. Jacobsen's motion for a new trial and vacated his convictions and sentences. However, the original indictment which had been issued on the basis of Defendants' fabricated evidence remained in effect and Mr. Jacobsen remained incarcerated on

bond pending a retrial. Mr. Jacobsen's family was not able to post the bond until November, 2020, although at that point Mr. Jacobsen still remained on home confinement.

72.    On August 25, 2021, the prosecution finally terminated in Mr. Jacobsen's favor when the Newton County District Attorney dismissed all charges against Mr. Jacobsen.

72.    In all, Mr. Jacobsen spent 30 years, 9 months, and 21 days incarcerated for crimes he did not commit.

## DAMAGES

73.    The unlawful actions of Defendants caused Mr. Jacobsen to spend more than thirty years—half of his life—in prison for crimes he did not commit.

74.    As a direct result of Defendants' intentional, bad faith, willful, wanton, reckless, and/or deliberately indifferent acts and omissions, Mr. Jacobsen sustained injuries and damages, including but not limited to the loss of freedom for more than thirty years; loss of his youth; pain and suffering; physical injuries, including injuries from physical altercations with guards and other inmates, the worsening of injuries and health conditions due to inadequate medical care; severe mental anguish; emotional distress; loss of family relationships; loss of income; severe psychological

damage; humiliation, indignities and embarrassment; degradation; permanent loss of natural psychological development; and restrictions on all forms of personal freedom including but not limited to diet, sleep, personal contact, educational opportunity, vocational opportunity, athletic opportunity, personal fulfillment, sexual activity, family relations, reading, television, movies, travel, enjoyment, and expression.

75.    All the acts and omissions committed by the Defendants described herein for which liability is claimed were done intentionally, unlawfully, maliciously, wantonly, recklessly, negligently and/or with bad faith, and said acts meet all of the standards for imposition of punitive damages.

76.    As a direct result of his unjust conviction and imprisonment, many of the foregoing effects of these damages continue to this day and will continue into the future.

## **<u>FEDERAL CLAIMS</u>**

### **COUNT I**

### **42 U.S.C. § 1983 Deprivation of Liberty without Due Process of Law and Denial of a Fair Trial by Fabricating Evidence and Withholding Material Exculpatory and Impeachment Evidence under the Fourteenth Amendment**

77.    Plaintiff hereby incorporates each of the allegations in paragraphs 1 through 76 as if fully set forth herein, and further alleges as follows:

20

78.     Defendants Allen and Roper fabricated false evidence of Mr. Jacobsen's guilt, thereby violating his right to a fair trial and causing him to be deprived of his liberty without due process of law. Defendants caused this false evidence to be used against Mr. Jacobsen in his prosecution and at trial.

79.     For example, Defendants Allen and Roper obtained false and fabricated eyewitness identifications through improper suggestion, coercion, and/or other improper means. In particular, Defendants used improper suggestion to cause B.T. and Knight to falsely identify Mr. Jacobsen as B.T.'s assailant. Defendants fabricated written reports falsely representing that B.T. and Knight had made bona fide identifications of Mr. Jacobsen and misrepresenting the true circumstances of Defendants' interviews with B.T. and Knight.

80.     Defendants Allen and Roper also fabricated written reports which misrepresented the substance of their interview with Mr. Jacobsen. Defendants falsely attributed to Mr. Jacobsen statements about his whereabouts at the time of the crime that Mr. Jacobsen never made and failed to document the alibi Mr. Jacobsen provided.

81.     Defendants also deprived Mr. Jacobsen of his right to a fair trial by withholding material exculpatory and impeachment evidence from prosecutors and

the defense in violation of the Constitution and *Brady v. Maryland*, 373 U.S. 83 (1963) and its progeny.

82.    For example, Defendants Allen and Roper suppressed evidence demonstrating Mr. Jacobsen was in Tennessee at the time of crime, including the tape-recorded statement in which Mr. Jacobsen provided his alibi. In addition, Defendants suppressed evidence of their misconduct. Defendants failed to disclose the true circumstances of their interviews with Knight and B.T. which demonstrated the identifications of Mr. Jacobsen by Knight and B.T. were fabricated and unreliable, including the improper suggestion Defendants used. Defendants also suppressed that their reports purporting to document their interview with Mr. Jacobsen were fabricated.

83.    The criminal case against Mr. Jacobsen was weak, and the only evidence against him was the foregoing false evidence fabricated by Defendants. Had the exculpatory evidence been disclosed, it would have cast doubt on the only evidence presented as to Mr. Jacobsen's guilt, would have been used at trial to impeach Defendants and other witnesses, and would have demonstrated the invalidity of Defendants' entire investigation. Defendants' actions, individually and cumulatively, played a direct and decisive role in the jury's guilty verdict and were

22

highly prejudicial to Mr. Jacobsen's defenses. In consequence, without the false evidence that Defendants fabricated, or had the exculpatory evidence been disclosed, Mr. Jacobsen's trial would most likely have had a different result.

84.    The foregoing acts and omissions were deliberate, reckless, wanton, cruel, motivated by evil motive or intent, done in bad faith, or involved callous indifference to Mr. Jacobsen's federally protected constitutional rights. These acts were perpetrated under color of state law. No reasonable officer would have believed this conduct was lawful in 1990.

85.    As a direct and proximate result of Defendants' actions, Mr. Jacobsen was wrongly arrested, detained, and charged with kidnapping, sodomy, and assault; prosecuted, convicted, and sentenced to life in prison; incarcerated for more than 30 years; and suffered the other grievous injuries and damages set forth above.

## COUNT II

### 42 U.S.C. § 1983 Fourth and Fourteenth Amendment Claim for Malicious Prosecution

86.    Plaintiff hereby incorporates each of the allegations in paragraphs 1 through 76 as if fully set forth herein, and further alleges as follows:

87.    Defendants Allen and Roper caused criminal proceedings to be brought against Mr. Jacobsen without probable cause and without any reasonable belief in

23

guilt. Mr. Jacobsen is completely innocent of the kidnapping and rape of B.T. As Defendants knew, the sole basis for the criminal action against Mr. Jacobsen was the fabricated and false identifications of Mr. Jacobsen by Knight and B.T. that Defendants obtained through improper suggestion. In addition, Defendants understood that Mr. Jacobsen could not have committed the crimes against B.T. because he was out of state at the time. By fabricating reports that misrepresented the truthful alibi Mr. Jacobsen provided, Defendants Allen and Roper caused the baseless criminal proceedings against Mr. Jacobsen in violation of his constitutional rights.

88.    No reasonable officer in 1990 would have believed that fabricated evidence provided probable cause to prosecute, and no reasonable officer in 1990 would have believed that a prosecution without probable cause was justified.

89.    Defendants Allen and Roper continued the prosecution against Mr. Jacobsen on the basis of false and fabricated inculpatory evidence and suppressed material exculpatory evidence, thereby subjecting him to an ongoing seizure in violation of the Fourth and Fourteenth Amendments.

90.    The criminal proceedings against Mr. Jacobsen were initiated with malice. Defendants Allen and Roper caused the charges against Mr. Jacobsen to be

filed by knowingly providing the prosecution misinformation, concealing exculpatory evidence, and otherwise engaging in wrongful and bad faith conduct that caused the initiation of the legal proceedings against Mr. Jacobsen when they knew there was no probable cause.

91.    Defendants initiated the action against Mr. Jacobsen for the purpose of denying his constitutional rights, including his right to be free from unreasonable seizure and his right not to be deprived of liberty without due process of law.

92.    As a direct and proximate result of Defendants' actions, Mr. Jacobsen was wrongly arrested, detained, and charged with kidnapping, aggravated sodomy, and aggravated assault; prosecuted, convicted, and sentenced to life in prison; incarcerated for more than thirty years; and suffered the other grievous injuries and damages set forth above.

93.    The criminal proceedings against Mr. Jacobsen terminated in his favor. After post-conviction DNA excluded Mr. Jacobsen as the source of the male DNA from B.T.'s rape kit, the Superior Court of Newton County vacated his convictions and sentences. On August 25, 2021, the prosecution finally terminated in Mr. Jacobsen's favor when the Newton County District Attorney dismissed all charges against Mr. Jacobsen.

## COUNT III

## 42 U.S.C. § 1983 Civil Rights Conspiracy

94.    Plaintiff hereby incorporates each of the allegations in paragraphs 1 through 76 as if fully set forth herein, and further alleges as follows:

95.    Defendants Allen and Roper agreed among themselves, and with others, to act in concert to deprive Mr. Jacobsen of his clearly established constitutional rights as protected by the Fourth and Fourteenth Amendments, including the right not to be deprived of liberty without due process of law and to be free from unreasonable detention.

96.    As described in detail above, in furtherance of the conspiracy, Defendants Allen and Roper engaged in and facilitated numerous overt acts in furtherance of the conspiracy, including but not limited to, the following misconduct:

a.    Defendants Allen and Roper, acted in concert to use improper suggestion to obtain false identifications of Mr. Jacobsen from B.T. and Knight;

b.    Defendants Allen and Roper acted in concert to fabricate reports misrepresenting the true circumstances of their interviews with B.T. and Knight which led to the identifications of Mr. Jacobsen;

26

c.    Defendants Allen and Roper acted in concert to fabricate reports misrepresenting the substance of their interview of Mr. Jacobsen; and

d.    Defendants Allen and Roper acted in concert suppress evidence of the actual alibi Mr. Jacobsen provided, including a tape-recording of their interview with Mr. Jacobson.

97.    No reasonable officer in 1990 would have believed this conduct was lawful. As a direct and proximate result of Defendants' actions, Mr. Jacobsen was wrongly arrested, detained, and charged with kidnapping, aggravated sodomy, and aggravated assault; prosecuted, convicted, and sentenced to life in prison; incarcerated for more than thirty years; and suffered the other grievous injuries and damages set forth above.

## STATE LAW CLAIMS

### COUNT IV

### Malicious Prosecution under O.C.G.A. § 51-7-40 et seq.

98.    Plaintiff hereby incorporates each of the allegations in paragraphs 1 through 76 as if fully set forth herein, and further alleges as follows:

99.    Defendants Allen and Roper caused criminal proceedings to be brought against Mr. Jacobsen without probable cause and without any reasonable belief in

guilt. Mr. Jacobsen is completely innocent of the kidnapping and rape of B.T. As Defendants knew, the sole basis for the criminal action against Mr. Jacobsen was the fabricated and false identifications of Mr. Jacobsen by Knight and B.T. that Defendants obtained through improper suggestion. In addition, Defendants understood that Mr. Jacobsen could not have committed the crime because he was out of state at the time. By fabricating reports that misrepresented the truthful alibi Mr. Jacobsen provided, Defendants Allen and Roper caused the baseless criminal proceedings against Mr. Jacobsen in violation of his constitutional rights.

100.   The criminal proceedings against Mr. Jacobsen were initiated with malice. Defendants Allen and Roper caused the charges against to be filed by knowingly providing the prosecution misinformation, concealing exculpatory evidence, and otherwise engaging in wrongful and bad faith conduct that caused the initiation and continuation of the legal proceedings against Mr. Jacobsen when they knew there was no probable cause.

101.   As a direct and proximate result of Defendants' actions, Mr. Jacobsen was wrongly arrested, detained, and charged with kidnapping, aggravated sodomy, and aggravated assaulted; prosecuted, convicted, and sentenced to life in prison;

incarcerated for more than thirty years; and suffered the other grievous injuries and damages set forth above.

102.    The criminal proceedings against Mr. Jacobsen terminated in his favor. After post-conviction DNA excluded Mr. Jacobsen as the source of the male DNA from B.T.'s rape kit, the Superior Court of Newton County vacated his convictions and sentences. On August 25, 2021, the prosecution finally terminated in Mr. Jacobsen's favor when the Newton County District Attorney dismissed all charges against Mr. Jacobsen.

**WHEREFORE**, Plaintiff Ronald Jacobsen prays as follows:

A.    That the Court award compensatory damages to Plaintiff and against all Defendants, jointly and severally, in an amount to be determined at trial;

B.    That the Court award punitive damages to Plaintiff, and against all individual Defendants in their individual capacity, in an amount to be determined at trial, that will deter such conduct by defendants in the future;

C.    For a trial by jury;

D.    For pre-judgment and post-judgment interest and recovery of Plaintiff's costs, including reasonable attorneys' fees pursuant to 42 U.S.C. § 1988 for all 42 U.S.C. § 1983 claims; and

E.    For any and all other relief to which Plaintiff may be entitled.

Dated: February 1, 2023

Respectfully submitted,

*/s/ Gerald Weber*
Gerald Weber
Georgia Bar No. 744878
LAW OFFICES OF GERRY WEBER, LLC
P.O. Box 5391
Atlanta, GA 31107
gweber@constitutional-litigation.com
(404) 932-5945

Anna Benvenutti Hoffmann*
NY Bar No. 4412011
Amelia Green*
NY Bar No. 5428412
Nick Brustin*
NY Bar No. 2844405
Owanaemi Briggs*
NY Bar No. 316617
*Attorneys not yet admitted to the Northern
District of Georgia; applications to practice
pro hac vice forthcoming*

NEUFELD SCHECK & BRUSTIN, LLP
99 Hudson Street, Eighth Floor
New York, NY 10013
(212) 965-9081